## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Daniel R.,

   Plaintiff,

v.

Frank Bisignano,[1]
*Commissioner of Social Security*,

   Defendant.

Case No. 24-cv-02529 (NEB/ECW)

**REPORT AND RECOMMENDATION**

---

This matter is before the Court on Plaintiff Daniel R.'s ("Plaintiff") brief in support of his Complaint (Dkt. 13) and Defendant Commissioner of Social Security's ("Defendant" or "the Commissioner") brief (Dkt. 15).[2]  This case has been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  Plaintiff filed this case seeking judicial review of a final decision by the Commissioner denying his application for supplemental security income ("SSI")

---

[1] The Complaint named Martin O'Malley, who was the Commissioner of the Social Security Administration when Plaintiff filed his Complaint.  (*See* Dkt. 1.)  Frank Bisignano was sworn in as the Commissioner of Social Security on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Bisignano should be substituted as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

benefits.[3]  (Dkt. 1.)  The Commissioner asks the Court to affirm the Commissioner's decision.  (Dkt. 15.)  For the reasons stated below, the Court recommends that Plaintiff's request for reversal and remand be denied and the Commissioner's decision be affirmed.

## I.    BACKGROUND

Plaintiff filed a Title XVI application for SSI on October 26, 2022, alleging disability beginning July 1, 2017.  (R. 246-49.)[4]  Plaintiff's application alleged disability due to a herniated lumbar disc, two back surgeries done and another needed, upper back problems, pain/numbness in his right leg, right arm problems, numbness in both feet, prescribed walker, prescribed cane, and anxiety.  (R. 272.)  His application was initially denied on February 9, 2023 (R. 163-66), and again denied on reconsideration on May 5, 2023 (R. 169-71, 173-75).  Plaintiff requested a hearing before an administrative law judge ("ALJ") on June 1, 2023 (R. 176-77), which was held on January 3, 2024 in front of ALJ Sarah Lough ("the ALJ") (R. 95).  The ALJ issued an unfavorable decision on February 23, 2024, finding that Plaintiff was not disabled from the October 26, 2022 application date through the date of the ALJ's decision.  (R. 29-46.)

---

[3]    Plaintiff's Complaint alleges that he applied for and was denied SSI benefits "and/or" Social Security Disability Benefits.  (Dkt. 1 ¶¶ 6-8, 10.)  The administrative record shows that Plaintiff only sought SSI benefits.  (*See* R. 246 (application for SSI); R. 169-71, 173-75 (reconsideration); R. 100 (ALJ stating application was for Title XVI benefits); R. 32 (ALJ's decision stating claim was for SSI benefits); R. 20 (Appeals Council stating claim was for SSI benefits).)  Accordingly, the Court treats the Complaint as seeking reversal only as to SSI benefits.

[4]    The Social Security Administrative Record ("R.") is available at Docket Entry 12.

Following the five-step sequential evaluation process under 20 C.F.R. § 416.920(a)[5]

(R. 33-34), the ALJ first determined at step one that Plaintiff had not engaged in

substantial gainful activity since October 26, 2022.  (R. 34.)  At step two, the ALJ

determined that Plaintiff had the following severe impairments: degenerative disc disease

of the cervical and lumbar spine, status post microdiscectomy procedures at L2-3 (the

---

[5]    The five steps are as follows:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 416.920(a)(4).

second and third vertebrae of the lumbar spine[6]) in 2018 and 2020; and mental health

impairments diagnosed to include generalized anxiety disorder, with insomnia.  (R. 34-

35.)  At step three, the ALJ determined that Plaintiff did not have an impairment that met

or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1.  (R. 35-37.)

At step four, after reviewing the entire record, the ALJ found Plaintiff's residual

functional capacity ("RFC") as follows:

> [Plaintiff is] able to perform occasional bending, stooping, kneeling, or
> crouching; no crawling; no climbing of ladders/ropes/scaffolds; no exposure
> to hazards (such as high exposed places and dangerous moving machinery);
> able to frequent overhead reaching bilaterally; no exposure to vibration; no
> driving as a job duty; should be permitted position changes for 5 minutes
> every hour while remaining on task and at the job station; should be permitted
> use of a cane for prolonged ambulation[7] and walking on uneven surfaces,
> with lifting/carrying sedentary weights with the alternate arm; and able to
> detailed but not complex tasks.

(R. 37.)  In arriving at this RFC, the ALJ found that Plaintiff's medically determinable

impairments could reasonably be expected to cause the alleged symptoms, but that

Plaintiff's statements concerning the intensity, persistence, and limiting effects of his

---

[6]     "Your lumbar spine consists of the five bones (vertebra) in your lower back.  Your
lumbar vertebrae, known as L1 to L5, are the largest of your entire spine."  *See* Lumbar
Spine, Cleveland Clinic (Feb. 17, 2022),
https://my.clevelandclinic.org/health/articles/22396-lumbar-spine (last visited May 15,
2025).

[7]     Ambulation is "the act, action, or an instance of moving about or walking."
Ambulation, Merriam-Webster, https://www.merriam-
webster.com/dictionary/ambulation (last visited May 15, 2025).

symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (R. 37-41.)

At step five, the ALJ determined that Plaintiff had no past relevant work experience, was 38 years old when his application was filed (defined as a "younger individual age 18-49"), had limited education, and the transferability of job skills was not an issue because Plaintiff did not have any past relevant work.  (R. 41.)  The ALJ concluded, based on the above RFC and the testimony of the vocational expert ("VE"), that Plaintiff was capable of performing the requirements of the following representative occupations: order clerk, Dictionary of Occupational Titles ("DOT") #209.587-014, with 20,000 national jobs; charge account clerk, DOT #205.367-014, with 30,000 national jobs; and ticket counter, DOT #219.587-010, with 35,000 national jobs.  (R. 41.)  Accordingly, the ALJ found that Plaintiff had not been disabled since October 26, 2022 through the date of the February 23, 2024 decision.  (R. 42.)

Plaintiff requested review of the decision by the Appeals Council on March 7, 2024.  (*See* R. 16.)  Plaintiff submitted additional evidence in the form of medical records for the period between November 20, 2023 and January 3, 2024, as well as from February 21, 2024.  (R. 77-94, 62-72.)  Plaintiff also provided additional medical records dated March 26, 2024.  (R. 47-61.)  On May 9, 2024, the Appeals Council denied Plaintiff's request for review.  (R. 15-19.)  The Appeals Council stated it did not exhibit the November 20, 2023 through January 3, 2024 and February 21, 2024 evidence because it did "not show a reasonable probability that it would change the outcome of the decision." (R. 16.)  Similarly, the ALJ did not exhibit the March 26, 2024 evidence because it did

"not relate to the period at issue" because the ALJ's decision was "through February 23, 2024." The Appeals Council's denial made the ALJ's decision the final decision of the Commissioner.[8]

Plaintiff then commenced this action for judicial review seeking reversal and remand to the Social Security Agency for further consideration. (Dkt. 1.) On August 26, 2024, the Commissioner filed a Request for Extension of Time to Answer and/or File the Certified Administrative Record (Dkt. 7), which was unopposed by Plaintiff. The Court granted the request and ordered the Administrative Record be filed by October 26, 2024. (Dkt. 10.) The Commissioner subsequently filed the Administrative Record on October 24, 2024. (Dkt. 12.) Plaintiff filed his brief in support of his Complaint on November 21, 2024 (Dkt. 13), the Commissioner filed a response on December 15, 2024 (Dkt. 15), and Plaintiff filed a reply on December 27, 2024 (Dkt. 16). The matter is now ready for decision. The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record in its analysis only when it is helpful for context or necessary for resolution of the specific issues presented by the parties.

---

[8]    Plaintiff does not challenge the Appeals Council's decision not to exhibit the supplemental evidence he provided or the finding that the medical records did not relate to the period at issue. The Court therefore does not discuss or consider this evidence or the Appeal Council's decision in this Order. *See generally Shannon S. D. v. Saul,* No. 19-CV-953 (NEB/KMM), 2020 WL 2060422, at *3 (D. Minn. Apr. 29, 2020) (quoting *Ridenhour v. Boehringer Ingelheim Pharm., Inc.*, 679 F.3d 1062, 1067 (8th Cir. 2012) ("When a magistrate judge is hearing a matter pursuant to his or her limited authority to make a recommended disposition, a claimant must present all his claims squarely to the magistrate judge, that is, the first adversarial forum, to preserve them for review.")).

## II.   RELEVANT FACTUAL RECORD

### A.   Medical Record Before the ALJ

The medical evidence in the record shows that Plaintiff was treated for back pain stemming from issues with his spine, specifically his lumbar and cervical spines.  The medical record shows evidence of spinal narrowing, degenerative change, and bulged discs in his spine.  (*E.g.*, R. 361, 370, 373, 376, 378, 381, 382-83, 386, 389, 390, 395, 495.)  Records also show he experienced radiculopathy.[9]  (*E.g.*, R. 385.)  On December 17, 2018, Plaintiff underwent a far lateral diskectomy[10] treating L2-3.  (R. 701-703.)  He also underwent a laminectomy[11] and microdiscectomy[12] on October 7, 2020 to treat radiculopathy at L3 and lateral disk herniation at L2-3.  (R. 398, 663-64.)  His surgeon, Ciro Antonio Vasquez, MD, offered to fuse his third and fourth lumbar vertebrae on February 9, 2021, but Plaintiff denied any interest in further surgical intervention.  (R.

---

[9]    Radiculopathy is caused by a pinched nerve in the spine, causing pain, numbness, or tingling.  Radiculopathy, Cleveland Clinic (Mar. 16, 2022), https://my.clevelandclinic.org/health/diseases/22564-radiculopathy (last visited May 15, 2025).

[10]   A diskectomy is a surgery to remove part or all of a spinal disc.  Diskectomy, Cleveland Clinic (Sept. 30, 2023), https://my.clevelandclinic.org/health/procedures/discectomy (last visited May 15, 2025).

[11]   A laminectomy is a surgery to remove the back arch or part of a spinal bone, called the lamina.  Laminectomy, Mayo Clinic (July 25, 2024), https://www.mayoclinic.org/tests-procedures/laminectomy/about/pac-20394533 (last visited May 15, 2025).

[12]   Microdiscectomy is a minimally invasive spine surgery to treat degenerative and herniated discs.  Microdiscectomy, Nw. Med., https://www.nm.org/conditions-and-care-areas/treatments/microdiscectomy (last visited May 15, 2025).

640.)  On April 11, 2023, two spinal cord stimulators were implanted to help control his

pain.  (R. 1210-12.)  The record also shows that Plaintiff received six epidural steroid

injections in either his lumbar or cervical spine.  (R. 714 (Nov. 23, 2018 lumbar

injection); R. 1027-29 (Oct. 19, 2022 lumbar injection); R. 1070-72 (Jan. 13, 2023

lumbar injection); R. 1067-69 (Feb. 1, 2023 cervical injection); R. 1208-09 (Apr. 25,

2023 cervical injection); R. 1205-07 (Oct. 9, 2023 cervical injection).)  Plaintiff also

underwent a nerve block procedure on November 8, 2022.  (R. 1024-26.)

Plaintiff wrote in his January 16, 2023 Function Report – Adult that he was

prescribed a walker, wheelchair, cane, and brace/splint for his health issues in 2017, all of

which he needed to use every day.  (R. 286.)  On October 1, 2020, Plaintiff reported to

Eric John Decuir, MD, during a telehealth visit that he was walking with a cane.  (R.

672.)  On October 2, 2020, Dr. Decuir saw Plaintiff in person and noted that Plaintiff

ambulated with a "grossly antalgic gait with the assistance of a cane."  (R. 670.)  On

November 3, 2020, Dr. Decuir noted that Plaintiff ambulated into the office with a cane.

(R. 650.)  Dr. Vasquez noted on February 9, 2021 that Plaintiff used a cane to ambulate

even though he had "good strength [in] the lower extremities."  (R. 640.)  Dr. Vasquez

also noted on May 4, 2022 that Plaintiff appeared to be in pain and used a cane to

ambulate.  (R. 545-47.)

Plaintiff saw Edina Nura Pain Clinic and Edina Nura Physical Therapy several

times from late 2022 to early 2023, but the majority of those records do not mention use

of a cane by Plaintiff (although Plaintiff's December 13, 2022 physical therapy intake

evaluation set as one goal "walk for 20-30 minutes without an assistance device and no

increase in symptoms in 3 months"). (R. 1019-22 (September 12, 2022) (pain clinic new patient evaluation); R. 1015-18 (October 10, 2022); R. 1006-10 (November 7, 2022); R. 999-1003 (December 5, 2022); R. 996-98, R. 1063-65 (December 13, 2022); 1058-62 (January 5, 2023); R. 1053-57 (February 3, 2023); R. 1049-52 (March 6, 2023).) On October 17, 2022, Plaintiff reported to Edina Nura Wellness Services during a behavioral health evaluation that his exercise consisted of "biking and walking." (R. 1011-12.) Plaintiff consulted with Dr. Decuir at Neurosurgical Associates on November 16, 2022, but he did not mention using a cane and Dr. Decuir's notes do not indicate any cane usage. (R. 494-98.)

A few days before Plaintiff saw Dr. Decuir on November 7, 2022, a Neurosurgical Associates clinic staff member called Plaintiff because he had taken a cane that belonged to the clinic and was only for patients' use while in clinic. (R. 498.) It is unclear when Plaintiff took the cane, although Plaintiff had stopped by the clinic on October 18, 2022. (*See* R. 498; R. 500.) Plaintiff told the staff member that he would return it in 15 minutes but had not done so as of two hours after the call. (R. 498.) Plaintiff returned the cane two days later on November 9, 2022 and the clinic took no further action. (R. 498.)

On November 20, 2023, Plaintiff saw a Physician Assistant. (R. 1085-88.) There is no mention of Plaintiff using a cane in those notes. (R. 1085-88.)

## B.    Hearing Before the ALJ

The ALJ conducted a hearing on Plaintiff's SSI claim on January 3, 2024. (Dkt. 95-122.) Plaintiff's counsel gave an opening statement in which he highlighted Plaintiff's "long history of back problems," specifically his past discectomies, failed

laminectomy syndrome,[13] degenerative disc disease, radiculopathy, and neuropathy.[14] (R. 102-03.)  Counsel also stated that Plaintiff had an appointment scheduled for later that day about a potential additional fusion in his spine.  (R. 102-03; *see also* R. 108 (Plaintiff testifying that appointment was for updated imaging).)  Plaintiff's counsel acknowledged that Plaintiff "is not using two canes or a walker," instead stating that Plaintiff's history of failed medical interventions—"multiple lumbar and cervical epidural steroid injections, medial branch blocks, failed spinal cord stimulator surgery about a year ago"—made him believe that Plaintiff's claim was one for chronic pain.  (R. 103.) Counsel stated that Plaintiff's issues prevented him from working full-time and his current employment at Domino's Pizza was only part-time. (R. 103.)

Plaintiff also testified at the hearing.  Plaintiff stated that he was then currently working as a customer service representative for Domino's Pizza 17 hours a week, comprised of one seven-hour shift and two five-hour shifts.  (R. 104.)  However, at the time of the hearing, Plaintiff was on medical leave and had been for about a week and a half.  (R. 104-05.)  Plaintiff testified that his employer understood his medical issues prior to his hiring.  (R. 105.)  Plaintiff also told the ALJ that his hourly work was capped at 17 to 21 hours a week due to the requirements of the state benefits he had previously

---

[13]    Failed laminectomy syndrome, now known as post-laminectomy syndrome, broadly defines a condition where a patient experiences back pain despite a prior spinal surgery.  Seth A. Waldman, Post-Laminectomy Syndrome, HSS (Mar. 7, 2024), https://www.hss.edu/conditions_post-laminectomy-syndrome.asp (last visited May 15, 2025).

[14]    Neuropathy is nerve damage that causes pain or numbness.  Neuropathy, Yale Med., https://www.yalemedicine.org/conditions/neuropathy (last visited May 15, 2025).

been receiving. (R. 105.) But he also testified that he would not be able to work more hours even if he were to receive them. (R. 105.) When asked if he could do the same job four days a week for seven-to-eight-hour shifts, he said he was "definitely" not able to do that. (R. 113.)

When examined by the ALJ, Plaintiff described two types of responsibilities in his Domino's position. One was interfacing with customers at the register at the front of the store, conducting transactions and handing out pizzas and utensils. (R. 104.) This position limited his walking to "two steps." (R. 104.) The other involved working on the pizza making line, stretching out the dough before passing it down to his coworkers to complete the pizza. (R. 104.) Plaintiff stated that he wore three braces to work everyday and that his boss accommodated his issues by allowing him to take breaks or leave work early, resulting in him working closer to 15 to 17 hours a week. (R. 105-06.)

On direct examination, Plaintiff first testified that he did not want to use these "extra breaks," and instead "wouldn't even take them, but [he] would go outside because [he] was on [his] feet for five hours, but anywhere from five to eight minutes [he] would go out the back door and sit down or in his [manager's] office." (R. 112.) Plaintiff then testified that these breaks would be hourly and "after like two hours he would let me go sit down and take a full 20-minute break." (R. 112.) Although his testimony is not perfectly clear, Plaintiff also appears to have testified that he was on his feet the entirety of the shift except when he went to the office to sit down for five minutes. (R. 115.) He also testified that he had left work early two or three times in the preceding year and

called in sick two or three times over that same period due to his medical issues. (R. 113.)

Plaintiff testified to using a cane prescribed to him by his surgeon every day about "half the day or more." (R. 109-10.) Plaintiff further testified that he brought his cane to work but did not use it on the job, relying on the three braces instead. (R. 115.) The braces were a cylinder brace, a back brace, and a knee brace. (R. 115.)

Plaintiff also testified that over the past year, he would get up at least four hours before his shift began in order to get his body active and stretch his muscles out. (R. 111.) Plaintiff testified that he was about to go on medical leave from work due to his medical issues, despite testifying earlier that he had started his medical leave about a week and a half before the hearing. (*Compare* R. 104-05, *with* R. 111-12.)

VE Aimee Mowery also testified at the hearing in response to the following hypotheticals posed by the ALJ:

> **[ALJ] Q** For the second hypothetical, please assume the hypothetical individual is able to perform a limited range of sedentary work. This hypothetical individual should be permitted to change positions for five minutes every hour while remaining on task and at the job station. Additionally, this hypothetical individual requires a cane for prolonged ambulation and walking on uneven surfaces. While utilizing the cane, the hypothetical individual can lift and carry the remaining required weight with the alternate arm. And, please add the same non-exertional limits as previously stated. I could say them again if you would like.
>
> **[VE] A** No, that's not necessary, thank you.
>
> **Q** Would such an individual be able to perform other work that exists in the national economy with that hypothetical?
>
> **A** Yes, in my experience, there would be work in the U.S. national economy in an office environment which would allow for the use of a cane. In my

experience, a cane is considered an accommodation in a manufacturing or production environment. The first one would be an order clerk, DOT number 209.587-014 with an SVP-2. And, in the U.S. national economy, there are approximately 20,000 positions. A second example would be a charge account clerk, DOT number 205.367-014 with an SVP-2 and in the U.S. national economy, there are approximately 30,000 positions. And, a third example would be a ticket counter, DOT number 219.587-010 with an SVP-2 and in the U.S. national economy, there are approximately 35,000 positions.

. . .

**Q** I know that the DOT was published some years ago and, as a result, some of the jobs in the DOT are not performed the way they used to be. Would you talk to me a minute about the jobs that you listed at the sedentary level and if they've been affected by modernization?

**A** Yes, there are some sedentary occupations that have changed due to modernization and technology that is available. And, the jobs I cited typically are performed similar in how they are described in the Dictionary of Occupational Titles. There may be slight changes with technology such as using (INAUDIBLE) for the order clerk where that was not indicated in the DOT. But, generally, all three occupations are performed in a similar manner.

(R. 118-20.)

## C.    ALJ's Opinion

The ALJ discussed Plaintiff's use of a cane several times in her opinion.  First, when analyzing Plaintiff's back pain in step three, the ALJ wrote:

The claimant's cervical and lumbar impairments are evaluated under listings 1.15 and 1.16, and do not meet or medically equal those listings. The record documents degenerative changes in the cervical and lumbar spine, with evidence of right cervical radiculopathy at C6-7 on an EMG from January 2023, described as chronic and inactive, and no evidence of lower extremity radiculopathy or peripheral neuropathy on EMGs from 2018 and early 2022. (Exhibits 3F; 5F/83-84, 178; 11F/43) The record documents no cervical/lumbar neurological deficits upon examination, and normal gait and station, with no medical need for a walker, bilateral canes, bilateral crutches, or a wheeled and seated mobility device involving the use of both arms, for any continuous 12-month period since October 26, 2022. (Exhibits 5F/8;

13

7F/17; 8F/18; 11F/14) At most, the claimant reported and testified to using a cane on a daily basis, which he indicated was prescribed. (Exhibit 3E/7; hearing record) However, the claimant was not noted to present with a cane to a neurosurgical consult in November 2022, to a pain clinic appointment in November 2022, to a physical therapy evaluation in December 2022, or to a physical examination with a spine specialist in November 2023. (Exhibits 5F/5-9; 8F/18; 10F/22-23; 11F/13-15)

(R. 35.)

At step four, the ALJ determined Plaintiff's RFC allowed him to

perform sedentary work as defined in 20 CFR 416.967(a) except: able to perform occasional bending, stooping, kneeling, or crouching; no crawling; no climbing of ladders/ropes/scaffolds; no exposure to hazards (such as high exposed places and dangerous moving machinery); able to frequent overhead reaching bilaterally; no exposure to vibration; no driving as a job duty; should be permitted position changes for 5 minutes every hour while remaining on task and at the job station; **should be permitted use of a cane for prolonged ambulation and walking on uneven surfaces**, with lifting/carrying sedentary weights with the alternate arm; and able to detailed but not complex tasks.

(R. 37 (emphasis added).)

The ALJ then concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R. 38.)  The ALJ explained this finding as follows:

The objective medical findings and course of treatment in this case support the above residual functional capacity, but not the degree of limitation alleged by the claimant. As indicated above, the record does document imaging evidence of degenerative changes in the cervical and lumbar spine, with chronic and inactive right cervical radiculopathy at C6-7 noted on an EMG from January 2023. However, no lumbar radiculopathy or peripheral neuropathy was documented on EMGs. (Exhibits 3F; 5F/6, 83-84, 178; 11F/14) Physical examination findings during the relevant period have been

unremarkable, other than tenderness of the cervical and lumbar spine in November 2022; . . . and positive facet loading and positive straight leg raising on the right in November 2023. (Exhibits 8F/18; 11F/14; 15F/23) The claimant was otherwise noted to have normal muscle bulk, strength, and tone in the upper and lower extremities, with no atrophy, and normal upper and lower extremity sensation and reflexes. (Exhibit 5F/8; 8F/18; 11F/14)

The record documents right L2-3 far lateral microdiscectomies in December 2018 and October 2020, but no other cervical or lumbar surgical procedures, other than a spinal cord stimulator trial in April 2023. (Exhibit 5F/174-175, 213; 15F/48) In February 2021, the claimant was offered instrumented fusion at L3-4, but he indicated he was not interested in any further surgery. (Exhibit 5F/151) In April 2022, however, the claimant reported that surgery was scheduled for May 2022, and he requested a prescription for narcotic pain medication until the surgery was performed. (Exhibit 5F/64) In September 2022, the claimant indicated that he was still waiting to schedule spine surgery. (Exhibit 5F/13) In November 2022, the claimant requested a medical work opinion, and it was advised that the claimant not work until further medical evaluation was completed. It was noted, however, that previous medical opinions had been given to support sedentary to light work. (Exhibit 5F/5) The claimant was to be referred for a functional capacity evaluation, but the record documents no follow-through. (Exhibit 5F/5) When seen for a neurosurgical consult in November 2022, it was noted that further lumbar surgery might not be of benefit to the claimant. (Exhibit 5F/9) When seen by a spine specialist in November 2023, the claimant was generally advised to avoid strenuous activity and heavy lifting, but no specific work limitations were set forth. (Exhibit 11F/15)

The record otherwise documents follow-up at a pain clinic for routine refills of narcotic medication, some diagnostic injections, and a one-week spinal cord stimulator trial. (Exhibits 8F; 10F; 11F/17-32; 15F) The claimant reported little to no pain relief, other than in response to narcotic medication. (Exhibit 10F/9, 14, 19; 11F/22, 32; 15F/2) The claimant requested a work excuse in July 2023, due to increased shoulder pain after moving furniture to have the carpet cleaned. (Exhibit 11F/21) He later reported working on a deck in November 2023. (Exhibit 14F/5) The claimant reported seeing a therapist through the pain clinic, and was advised to continue doing so, but the record documents only one evaluation with a pain clinic counselor in November 2022. (Exhibits 7F/22; 8F/15-16; 9F/5, 12; 14F/10, 19) The claimant also underwent a single physical therapy session in December 2022, but was discharged in March 2023, because he did not return for any further therapy sessions. (Exhibits 8F/7-8; 10F/7) In January 2023 and February

2023, however, the claimant reported that physical therapy was going well. (Exhibit 10F/14, 19)

To address the claimant's physical impairments, I have reduced the claimant to the sedentary exertional level, with additional postural, manipulative, and environmental limitations as set forth above, as well as no driving as a job duty due to the claimant's chronic use of narcotic pain medication. This residual functional capacity takes into consideration the claimant's subjective complaints, within the context of the imaging and EMG evidence, physical examination findings, and generally conservative course of treatment. It also takes into consideration the claimant's reported work activity as a customer service representative, requiring significant standing/walking throughout a five to seven-hour workday, with an allowance for additional work breaks every hour to allow the claimant to sit for five to eight minutes, which the claimant testified he did not always take. (Exhibit 7E/2; hearing record) Notably, the claimant indicated that he restricted his work hours based on advice from a county employee regarding the number of hours he could work and still receive county benefits. Although he testified he did not think he could perform his job as a customer service representative more than 17 hours per week, he did not testify that he tried any work requiring less standing/walking.

(R. 38-39 (footnote omitted).)

## III.    LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g) and *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions."  *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007) (marks and citations omitted).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Id.*  "If

substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).

## IV.    DISCUSSION

Plaintiff contends that the ALJ "erred as a matter of law by failing to build an accurate and logical bridge to the RFC limitations, including by formulating an RFC that is vague and confusing." (Dkt. 13 at 6, 8 (all capitalized in original).) More specifically, according to Plaintiff:

> [T]he ALJ erred in using vague and ambiguous language in her RFC assessment which did not clearly identify the limitations resulting from Plaintiff's severe impairments. In addition, by using vague and ambiguous language in formulating the RFC, the ALJ failed to build an accurate and logical bridge between the evidence and final result of the RFC.

(*Id.* at 9.)

Plaintiff highlights that no medical opinion or other medical record uses the term "prolonged ambulation." (*Id.* at 10.) Plaintiff further argues that "prolonged" is also not defined in the Social Security context, and cites several cases for the proposition that "many courts . . . have determined that the use of the word 'prolonged' does not provide a quantifiable work related limitation." (*Id.* (citing *Steven S. v. Kijakazi*, Civ. No. 21-1201 (WMW/BRT), 2022 WL 2960009, at *10 (D. Minn. Jun. 6, 2022) ("Thus, the ALJ did not err in assigning less weight to Montague's use of the word 'prolonged,' which did not provide any quantifiable work-related limitations."); *Wilson v. Saul*, No. 4:19 CV

1000 RWS, 2020 WL 836396, at *8 (E.D. Mo. Feb. 20, 2020) (affirming decision where ALJ found opinion regarding "prolonged sitting" vague); *Arden B v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 4636221, at *6 (N.D. Iowa Sep. 30, 2022) ("But district courts have upheld the ALJ's decision to find a medical opinion unpersuasively vague when it used terms like 'prolonged' rather than a definitive amount of time.") (footnote omitted)); Dkt 16 at 2 (citing same cases).)

Plaintiff asserts that without a definition, it is not clear what Plaintiff's maximum functional abilities are.  (Dkt. 13 at 10; Dkt. 16 at 1.)  Plaintiff further asserts that the absence of "clarity" around this term means the ALJ's decision cannot meaningfully be reviewed, the RFC cannot be relied upon in the step five determination, and the Court cannot determine whether the VE's testimony is reliable.  (Dkt. 13 at 11-12.)  Plaintiff also contends that the ALJ's "vague conclusion" is "especially significant" due to the evidence in the record relating to his daily use of a cane, his use of electric wheelchairs in stores, numbness in his feet, and his difficulties walking.  (Dkt. 16 at 2.)

The Commissioner responds that the ALJ's determination that Plaintiff should be permitted use of a cane for prolonged ambulation and walking on uneven surfaces was not vague and confusing.  (Dkt. 15 at 7.)  The Commissioner cites cases "within the Eighth Circuit have upheld ALJ decisions where the RFC contained limitations similar to the limitations found in this case" and argues that the ALJ's overall decision allows the Court to follow the ALJ's reasoning and understand how the ALJ arrived at her conclusions.  (*Id.* at 8-9.)  Finally, the Commissioner argues that the hypothetical question to the VE that mirrored the RFC constitutes substantial evidence for the ALJ's

conclusion at step five and the VE's response demonstrates that the term at issue is not impermissibly vague.  (*Id.* at 10-11.)

A claimant's RFC is the "most [he] can do despite his limitations, including both physical and mental limitations."  *LeeAnthony C. v. Berryhill*, No. 18-CV-77 (NEB/TNL), 2019 WL 2343732, at *3 (D. Minn. May 13, 2019) (citing 20 C.F.R. § 416.945).  An ALJ's determination of "a claimant's RFC must be 'based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations."  *Id.* (quoting *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013)).  "The RFC is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."  *Ackerman v. Kijakazi*, No. 4:21-CV-814 PLC, 2023 WL 2496839, at *4 (E.D. Mo. March 14, 2023) (quoting *Roberson v. Astrue*, 481 F.3d 1020, 1023 (8th Cir. 2007)) (cleaned up).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  *Id.* (quoting *Combs v. Berryhill*, 878 F.3d 642, 646) (8th Cir. 2017)).

Social Security Ruling ("SSR") 96-8p sets forth the Social Security Administration's policies and policy interpretations regarding the assessment of the RFC.  According to SSR 96-8p, the RFC "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p, 1996 WL

374184, at*7 (S.S.A. July 2, 1996). However, there is no requirement that an ALJ follow each RFC limitation with a list of specific, supporting evidence. *See Wilfong v. Berryhill*, No. 4:17-CV-2747-SNLJ, 2018 WL 4489453, at *4 (E.D. Mo. Sept. 19, 2018); *Zorsch v. Berryhill*, 2018 WL 3493087 at *3 (W.D. Mo. Jul. 20, 2018); *Kimmel v. Berryhill*, 2017 WL 1105122 at *5 (E.D. Mo. Mar. 24, 2017). "Moreover, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citation and marks omitted). In addition, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers*, 721 F.3d at 526-27; *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527) (cleaned up).

The Court begins with Plaintiff's contention that "prolonged ambulation" is impermissibly vague, as that is the basis for Plaintiff's other arguments. In *Kimball v. Colvin*, the Western District of Missouri considered whether "the phrase 'prolonged ambulation' is impermissibly vague." No. 13-0851-CV-W-ODS, 2014 WL 6680533, at *2 (W.D. Mo. Nov. 25, 2014). The *Kimball* court found the phrase was not impermissibly vague for two reasons. *Id.* "First, the VE was able to understand the phrase." *Id.* Second, the VE's testimony made "clear" that it did not make "any difference how much ambulation qualifies as 'prolonged' because the jobs she identified

20

are primarily performed in place and really would not require much ambulation or moving around." *Id.* (cleaned up).

The same is true here. First, Plaintiff has not argued that the VE did not understand what the ALJ meant by "prolonged ambulation," and the record is clear that the VE had no question as to what the term meant. (R. 118.) When posed with a hypothetical where the "hypothetical individual requires a cane for prolonged ambulation and walking on uneven surfaces," the VE responded: "Yes, in my experience, there would be work in the U.S. national economy in an office environment which would allow for the use of a cane. In my experience, a cane is considered an accommodation in a manufacturing or production environment." (R. 118.) The VE then identified the three jobs relied on by the ALJ in her opinion. (R. 118.) The VE further testified that while the DOT did not address the use of a cane, she relied on her experience and that the remainder of her testimony was consistent with the DOT and the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles. (R. 119-20.) This demonstrates that the VE understood the meaning of "prolonged ambulation." (R. 118.) Indeed, the lack of ambiguity as to "prolonged ambulation" is underscored by the fact that Plaintiff—who was represented by counsel at the hearing before the ALJ—did not object to the term during the hearing. *See Weiser v. Berryhill*, No. 4:16-CV-01519-AGF, 2017 WL 4264009, at *3 (E.D. Mo. Sept. 26, 2017) ("The VE did not express any difficulty understanding the ALJ's hypothetical, and if Plaintiff, who was represented by counsel, believed clarification was necessary, she could have submitted further questions to the VE or requested a supplemental hearing.").

Second, the *Kimball* court rejected the challenge to "prolonged ambulation" because the jobs the VE testified to in that case were "primarily performed in place and really would not require much ambulation or moving around."  2014 WL 6680533, at *2 (citation omitted).  The same is true here.  The RFC and corresponding hypothetical to the VE limited Plaintiff to "sedentary" work, limiting him to standing and walking no more than two hours out of an eight-hour workday.  *See* 20 C.F.R. § 416.967(a); Titles II and XVI: Determining Capability to do Other Work--The Medical-Vocational Rules of Appendix 2, SSR 83-10, 1983 WL 31251, at *5 (S.S.A. Jan. 1, 1983).  Further, all three positions identified by the VE and ALJ—order clerk, charge account clerk, and ticket counter—are both sedentary and only "may involve walking or standing for brief periods of time."  DICOT 209.587-014 (G.P.O.), 1991 WL 671798 (Credit-Card Clerk); DICOT 205.367-014 (G.P.O.), 1991 WL 671715 (Charge-Account Clerk); DICOT 219.587-010 (G.P.O.), 1991 WL 671989 (Parimutuel-Ticket Checker).  And given the standing/walking limitations in the three sedentary positions identified by the VE, there is no evidence that a more specific definition of "prolonged" would have changed the VE's testimony.  *See Polter v. Astrue*, No. 4:10CV1965 CDP, 2012 WL 1060124, at *13 (E.D. Mo. Mar. 29, 2012) ("There is no reason to assume that the VE's evaluation of Polter's ability to maintain employment would have been different had she been presented with a specific time period for the frequency of sitting and standing required; her opinion allowed for frequent changes of position, which sufficiently addressed Polter's need to alternate between sitting and standing.  Therefore, claimant's argument that the RFC is

impermissibly vague fails."), *aff'd*, 496 F. App'x 698 (8th Cir. 2013).  The Court finds the reasoning in *Kimball* persuasive and rejects Plaintiff's challenge for the same reasons.

Moreover, the lack of ambiguity as to "prolonged ambulation" under these circumstances is underscored by the fact that the Eighth Circuit and district courts within this Circuit have affirmed RFCs that employed the term "prolonged" on multiple occasions.  *See, e.g.*, *Gann v. Berryhill*, 864 F.3d 947, 951 (8th Cir. 2017) (affirming RFC where claimant was limited to "jobs that can be performed while using a handheld assistive device or a wheelchair for uneven terrain or prolonged ambulation"); *Mikus v. Kijakaz*i, No. 2:20-CV-00065-SEP, 2022 WL 741856, at *2 (E.D. Mo. Mar. 11, 2022) (affirming RFC that included limitation that claimant was "is limited to jobs that can be performed while using a handheld assistive device required for prolonged ambulation and uneven terrain"); *Hall v. Comm'r of Soc. Sec.*, No. 18-CV-2032-LTS-KEM, 2019 WL 7666529, at *1 (N.D. Iowa Aug. 16, 2019) (affirming RFC that included "limited to jobs that can be performed while using an assistive device for uneven terrain or prolonged ambulation only"), *R. & R. adopted sub nom. Hall v. Saul*, 2019 WL 5085427 (N.D. Iowa Oct. 10, 2019); *Sohn v. Saul*, No. 4:18-CV-219 NAB, 2019 WL 4750415, at *2 (E.D. Mo. Sept. 30, 2019) (affirming RFC included the claimant needed the "use of assistive device for prolonged ambulation"); *Mills v. Berryhill*, No. CV 16-5223, 2017 WL 3526669, at *1 (W.D. Ark. Aug. 16, 2017) (affirming RFC where claimant was "limited to jobs that can be performed while using a hand-held assistive device for prolonged ambulation."); *Barnosky v. Berryhill*, No. 17-00126-CV-W-RK-SSA, 2017 WL 6388965, at *1 (W.D. Mo. Dec. 14, 2017) (affirming RFC that required "the use of an assistive

device for prolonged ambulation").  Indeed, at least one district court in the Eighth

Circuit has relied on a "prolonged ambulation" limitation when rejecting the argument

that an ALJ failed failure to properly consider the claimant's subjective complaints.  *See*

*Madry v. Kijakazi*, No. 4:20-CV-299-SNLJ, 2021 WL 4168204, at *4 (E.D. Mo. Sept. 14,

2021) (affirming RFC including limitation that the claimant "needs to [use] a cane for

prolonged ambulation").

        In contrast, the cases cited by Plaintiff involve a challenge to an ALJ's decision

not to rely on a medical opinion that used the word "prolonged."  *See Steven S. v.*

*Kijakazi*, No. CV 21-1201 (WMW/BRT), 2022 WL 2960009, at *9-10 (D. Minn. June 6,

2022) (affirming ALJ's decision to discount medical opinion that restricted claimant to

"no prolonged sitting, standing, driving; limited twisting and bending"), *R. & R. adopted*,

No. 21-CV-1201 (WMW/BRT), 2022 WL 2954033 (D. Minn. July 26, 2022); *Wilson v.*

*Saul*, 4:19 CV 1000 RWS, 2020 WL 836396, at *8 (E.D. Mo. Feb. 20, 2020) (affirming

decision where ALJ found opinion regarding "prolonged sitting" vague); *cf. Arden B. v.*

*Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 4636221, at *6 (N.D. Iowa Sept. 30, 2022)

(affirming ALJ's decision to discount medical opinion's use of the phrase "long period").

These cases are distinguishable for several reasons, including because use of "prolonged"

in a medical opinion where it is unknown what the provider meant by that term is very

different from the use of "prolonged ambulation" in the context of a hypothetical and

RFC containing additional constraints on standing and walking in a hearing where any

party—including Plaintiff's counsel—could object to or seek clarification of the term's

meaning.

Plaintiff also argues that it is unclear if "prolonged ambulation" is consistent with a sedentary (standing and walking for up to two hours) limitation. (Dkt. 13 at 12.) The Court disagrees. The ALJ explained that the "sedentary" limitation is subject to the "additional postural, manipulative, and environmental limitations as set forth above . . . ." (R. 38-39 (emphasis added).) Further, using a cane dictates the manner in which Plaintiff would ambulate—not how long Plaintiff would ambulate. Finally, as discussed above, neither the VE nor Plaintiff's counsel expressed any confusion about any such conflict during the hearing before the ALJ. The Court finds no conflict or confusion here. *See Chismarich*, 888 F.3d at 980 ("[O]ur deferential standard of review precludes us from labeling findings as inconsistent if they can be harmonized.").

In sum, the Court concludes that the RFC's limitation that Plaintiff must be "permitted use of a cane for prolonged ambulation" is not impermissibly vague and ambiguous. The Court turns to Plaintiff's "logical bridge" and other remaining arguments.

Beginning with the "logical bridge," courts in this District (and other courts) have used that term when reviewing an ALJ's decision. *See, e.g.*, *Bobby S.W. v. Dudek*, No. 24-CV-3047 (DJF), 2025 WL 607099, at *3 (D. Minn. Feb. 25, 2025) ("At minimum, the ALJ must build a logical bridge between the evidence and the RFC he creates."); *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) ("The ALJ . . . must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. If the evidence does not support the conclusion, we cannot uphold the decision.") (citations omitted). However, it

is unclear whether there is a "logical bridge" requirement that is separate and distinct

from the requirements of SSR 96-8p in the Eighth Circuit.  In any event, it does not

matter, because the Court finds that the ALJ complied with the requirements of SSR 96-

8p and built a logical bridge to this limitation in the RFC (to the extent the ALJ was

required to do so).

As to Plaintiff's use of a cane and ability to walk and stand, the ALJ stated the

RFC

> takes into consideration the claimant's subjective complaints, within the
> context of the imaging and EMG evidence, physical examination findings,
> and generally conservative course of treatment. It also takes into
> consideration the claimant's reported work activity as a customer service
> representative, requiring significant standing/walking throughout a five to
> seven-hour workday, with an allowance for additional work breaks every
> hour to allow the claimant to sit for five to eight minutes, which the claimant
> testified he did not always take.

(R. 39.)

The ALJ explained that she found it notable that "the claimant indicated that he

restricted his work hours based on advice from a county employee regarding the number

of hours he could work and still receive county benefits" and further observed that

"[a]lthough [Plaintiff] testified he did not think he could perform his job as a customer

service representative more than 17 hours per week, he did not testify that he tried any

work requiring less standing/walking."  (R. 39.)  Finally, the ALJ discussed Plaintiff's

testimony that he used a cane on a daily basis and also the fact that Plaintiff did not

"present with a cane" to several appointments in November 2022, December 2022, and

November 2023.  (R. 35.)  The Court finds that the ALJ's analysis constitutes a sufficient

"narrative discussion describing how the evidence supports each conclusion" as required by SSR 96-8p with respect to the RFC's limitation that Plaintiff "should be permitted use of a cane for prolonged ambulation and walking on uneven surfaces."

Plaintiff also appears to argue that SSR 96-8p required the ALJ to state a time limit as to ambulation in the RFC or discuss exactly how long Plaintiff could ambulate with a cane. But Plaintiff cites no law supporting that argument, and the Court finds it unpersuasive where the VE understood the "prolonged ambulation" limitation and Plaintiff's counsel did not object to it at the hearing before the ALJ. *See Kasey K. v. Kijakazi*, No. 22-CV-2029 (WMW/DLM), 2023 WL 5754115, at *3 (D. Minn. July 13, 2023) ("Indeed, despite the challenge Plaintiff now raises to the ALJ's decision for using the phrase 'sequential linear tasks,' her counsel sought no clarification or expansion of the phrase at her hearing before the ALJ, and the vocational expert expressed no confusion about its meaning. Plaintiff's current preference for a more precisely-described limitation would impose a standard of review that is unsupported by the law.") (citing *Galloway v. Kijakazi*, 46 F.4th 686, 690 (8th Cir. 2022)), *R. & R. adopted*, 2023 WL 5624007 (D. Minn. Aug. 31, 2023). Finally, as the above discussion demonstrates, the Court was able to meaningful review the ALJ's decision and reasoning with respect to the "prolonged ambulation" limitation.

In sum, the Court finds the "prolonged ambulation" term was not impermissibly vague and that the ALJ complied with the regulatory requirements in both determining this functional limitation when setting the RFC and explaining her decision. The VE's response to the hypothetical containing this limitation constitutes substantial evidence for

27

the ALJ's decision at step five. *See Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996) ("Testimony from a VE based on a properly phrased hypothetical question constitutes substantial evidence.") (citations omitted).

For these reasons, the Court recommends denying Plaintiff's request for reversal or remand, granting the Commissioner's request to affirm the ALJ's decision, and dismissing the Complaint with prejudice.

## V. RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS RECOMMENDED** that:

1.    Plaintiff's request for reversal and remand of the Commissioner's decision (Dkt. 13) be **DENIED**;

2.    The Commissioner's request that the Court affirm the decision (Dkt. 15) be **GRANTED**; and

3.    The Complaint (Dkt. 1) be **DISMISSED WITH PREJUDICE**.


DATED:  May 15, 2025                    *s/Elizabeth Cowan Wright*
                                        ELIZABETH COWAN WRIGHT
                                        United States Magistrate Judge

## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D.

Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).